**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| **CHASE MALONE, individually and as the assignee of certain rights of Kareem Boynes;** | **Case No.: ST 2022-cv-00057** |
| **Plaintiff,** | **Super. Ct. Case No. ST-22-CV-269** |
| **v.** | **ACTION FOR DECLARATORY RELIEF, BREACH OF CONTRACT, BAD FAITH AND** |
| **INDEMNITY INSURANCE COMPANY OF NORTH AMERICA a/k/a "CHUBB";** | **PUNITIVE DAMAGES** |
| **Defendant.** | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT VII AGAINST CHUBB**

The Plaintiff moves for partial summary judgment pursuant to Rule 56 on Count VII of the Amended Complaint against Chubb, which is generally known as the *prima facie tort.*

As will be seen, the evidence demonstrates that Chubb realized in the adjusting process that the policy it believed was applicable to this claim did not cover Boynes. Chubb also believed its exposure on the claim against Island Time was limited to $150,000 based on a maritime "limitation of liability" defense, which was not available to Boynes. Thus, Chubb made a calculated decision to mislead Boynes into thinking he had insurance coverage so that he would cooperate with Chubb in its efforts to limit its total exposure to $150,000.

In doing so, Chubb did not analyze Boynes exposure to the claim, nor did Chubb do any of the traditional things an insurer does in defending a claim, as Chubb knew it would deny coverage at some point. Chubb also knew that Boynes would be harmed by its conduct, but it chose its own interests over his. As will be discussed, this calculated, outrageous conduct is exactly what the *prima facie tort* was designed to protect against.

Based on the applicable law and the undisputed facts established in discovery, partial summary judgment should be granted on Count VII. [1]

---

[1] The summary judgment standard has been addressed in another motion for partial summary judgment filed at the same time as this motion regarding Counts I and III of the Amended Complaint, which was discussed in Section I of the memorandum in support of that motion, and is incorporated herein by reference.

1

## I.    Statement of Facts

These facts support this motion for partial summary judgment as to Count VII, with the supporting references in the record attached to the Rule 56.1 filing submitted with this motion:

1. On April 17, 2021, Chase Malone was seriously injured on a boat that hit a wave, throwing him into the air and then onto the deck, breaking his back. **Ex. 1.**

2. On June 23, 2021, Malone sued the captain of the boat, Kareem Boynes, and his employer, Island Time, for damages caused by Boynes' negligence, alleging that Boynes was acting within the scope of his employment for Island Time. **Ex. 1.**

3. On August 11, 2021, counsel retained by Chubb to defend this case, Hamilton, Birthle, and Miller (HMB), filed a Notice of Appearance for Island Time and Boynes. **Ex. 1**.

4. On August 12, 2021, Chubb's primary adjuster assigned to the claim, Greg Vacek, issued a "claim alert" after reviewing the Complaint, as the damages alleged in the complaint could exceed Chubb's policy limits. **Ex. 2** at 21-23.

5. On September 15, 2021, HMB filed an Answer for both defendants. **Ex. 1**.

6. On September 16, 2021, one of Chubb's maritime adjusters, Jonathan Nieves, determined that Chubb Policy N10694486 provided coverage for both Island Time and Boynes.[2] **Ex. 3**.

7. On September 21, 2021, HMB filed a Rule 26 Disclosure for Island Time and Boynes, stating that there was insurance that covered this claim. **Ex. 1**.

8. On September 28, Chubb decided to split the adjusting files for Island Time and Boynes, allegedly because it learned that Boynes consumed alcohol while operating the boat on April 17, 2021, assigning Boynes' claim to "Dave's team." **Ex. 2** at 26-28.

9. The head of "Dave's team" is Dave Koudelik, a claims manager for Chubb (**Ex 2** at 27-28). He testified in his deposition that the file split was due to the fact that Boynes' consumption of alcohol created a coverage issue. **Ex. 4** at 10-12.

10. Koudelik also testified that a Reservation of Rights letter ("ROR") should have been sent to Boynes at that time.[3] **Ex. 4** at 12.

11. On October 18, 2021, Chubb had HMB file a Limitation of Liability Action for Island Time, seeking to limit its liability to the value of the boat involved in the incident, alleged to be $150,000. **Ex. 5.**

---

[2] Only the relevant sections of this policy are in Ex. 2, but the entire policy can be produced if needed. It will be referred to as "Policy 486" hereinafter.

[3] As discussed in the memorandum filed with this Rule 56.1 filing, Reservation of Rights letters (ROR) are letters sent by insurers when they decide to defend an insured, but are not certain there is coverage, so the insurer puts the insured on notice that it may deny coverage at a later date, but will provide a defense for the claim now.

12. Vacek acknowledged that while Chubb was trying to cap Island Time's liability at $150,000, and hence its own exposure for the claim against Island Time, Boynes had no such maritime defense that might limit his exposure. **Ex. 2** at 31.

13. On October 26, 2021, Vacek set a reserve for the claim against Island Time at $150,000.Vacek testified that when he set this reserve, he had a high level of confidence that the limitation defense would be successful, capping Chubb's exposure on this claim at $150,000. **Ex. 2** at 32-33.

14. Koudelik testified that no reserve was ever set for Boynes' claim, as no reserve is set if he is not covered for this claim. **Ex. 4** at 37. The adjuster Koudelik assigned to the file, John Carey, echoed this fact—no reserve was ever set for Boynes because there was no coverage.  **Ex. 6** at 37.

15. On November 16, 2021, Carey, contacted Attorney Simpson to represent Boynes, stating that an undisclosed conflict had arisen, so Boynes needed new counsel. **Ex. 7**.

16. On January 4, 2022, Koudelik put this note in the claim file: "we are having this matter reviewed by the internal coverage unit to provide coverage findings in light of facts - will monitor for review and draft appropriate coverage response accordingly." **Ex. 8.** Chubb asserted the attorney-client privilege as to the content of that communication with the "internal coverage unit," meaning in-house lawyers were involved. **Ex. 1**.

17. In discovery, Chubb produced a redacted email chain that showed that Doniger had at least 10 email exchanges between December 7, 2021, and January 7, 2022, with Chubb's adjusters and Chubb's in-house counsel regarding coverage under policy 468, asking Vacek on December 8, 2021, for a copy of the ROR sent to Boynes. **Ex. 9.**

18. On January 11, 2022, Attorney Simpson substituted as counsel for Boynes in place of HMB, and filed an answer to the First Amended Complaint, admitting Boynes was acting within the scope of his employment. **Ex. 1**.

19. On January 24, 2022, the Parties entered into a new scheduling order that set May 15, 2022 as the deadline for the completion of fact discovery,  with mediation to follow the completion of fact discovery. **Ex. 1**.

20. On January 25, 2022, there was an email exchange between Carey and Simpson about the case status (**Ex 10**), with Simpson reporting that he was having trouble contacting Boynes. The email also notified Carey of the case deadlines imposed by the court, including completing fact discovery by May 15th. Simpson also asked:

> Can you please provide me with a copy of the relevant insurance policy and any reservation of rights letters? I understand that there is a discussion about withdrawing the ROR, but until that is done, I need to have it (and am required to produce it to the plaintiff).

21. On January 25, 2022, Carey entered this note in the adjusting file (**Ex 11**):

> followed up with defense counsel for initial evaluation. Additionally, will be setting up discussion with coverage team to discuss the applicable coverage

22. On January 26, 2022, Simpson spoke with Boynes for the first time. **Ex 1.**

23. On January 28, 2022, Carey again took note of the internal coverage review. **Ex 12.**

24. In its discovery responses, Chubb stated under oath that its adjusters and in-house attorneys had completed its reassessment of coverage, including speaking with Nieves and the underwriter who issued the policy, Carrie Garrison, by February 7th, 2021, concluding that policy 486 did not cover Boynes, but that it did not send an ROR to Boynes as they did not know how to contact him. **Ex 13.**

25. On February 7, 2022 (8:35 AM), Simpson emailed Carey asking again about the ROR letter, also noting that he had spoken with Boynes, stating (**Ex. 14**):

> **FYI, I was finally able to get through to Mr.. Boynes after tracking down a new email address for him"** (Emphasis added).

Carey responded minutes later (9:47 AM EST, 8:47 AST) (**Ex. 15**), noting:

> I am working through the coverage situation currently and no ROR has been issued to date. I expect to have this resolved within the week and provide you with a copy of the ROR once complete.

26. Moreover, Carey subsequently testified that in fact he had no trouble reaching Boynes once he needed to send him the completed denial of coverage letter. **Ex. 6** at 51-52. As Vacek noted, Island Time would always have Boynes' contact information. **Ex 2** at 42.

27. On March 2, 2022-Vacek emailed Carey asking "Did you ever write a ROR on your side for Boynes? **Ex. 16.**

28. On March 4, 2022-Koudelik sent an email to Vacek asking (**Ex. 17**):

> Coverage is still under review and is somewhat complicated by the fact that Captain Kereem Boynes is unable to be located/contacted. . . .

29. On May 15, 2022, the fact discovery deadline expired, with Simpson never sending any written discovery pursuant to Rules 33, 34, or 36, nor did he take any depositions of any fact or medical witnesses. Indeed, he never even sent a medical authorization to Malone. **Ex. 1**. [4]

30. On May 23, 2022-Simpson sent his first report to Carey giving an update after Malone's deposition was taken. Simpson suggested that Chubb hire an investigator to do surveillance on Malone as well as to hire certain specific medical experts. **Ex. 18.**

31. Chubb never authorized any surveillance, nor did it hire the medical experts he had recommended (a psychiatrist, a physical therapist and orthopaedic specialist). **Ex 1.**

---

[4] The court subsequently permitted a deposition of Malone after fact discovery had expired, but that deposition was limited to the issue of damages since it was not taken prior to the expiration of fact discovery. **Ex. 1**.

32. As fact discovery was complete and Malone had produced his expert reports, he sent a policy limits demand to Boynes on June 1, 2022, for the entire limits of Boynes' available insurance coverage, with the demand expiring on July 1, 2022. **Ex. 1**.

33. Mediation was set for June 29, 2022, two days before the policy limits demand expired. **Ex. 1**.

34. On June 27, 2022, Simpson sent a second report to Carey for the upcoming mediation, discussing liability and damages. The report did not mention anything about a potential comparative negligence finding against Malone, nor did his report mention Malone's alleged insobriety or his alleged failure to heed the Captain's alleged instruction for him to move to the back of the boat. **Ex 19.**

35. In his June 27th report, Simpson said he had conferred with Island Time's counsel, Chivonne Thomas (of HMB) and both recommended offering Chubb's $1,000,000 policy limits at mediation to try to settle the entire case. Simpson also stated that while liability was not clear, if a jury finds liability, the damages could be $10,000,000 (or more). **Ex 19.**

36. In his deposition in this case, Simpson said he thought Island Time had a good chance of succeeding with their limitation of liability defense, leaving Boynes as the only defendant. He thought Boynes had a good chance of prevailing because of a photo he had seen which showed that the seas were calm. **Ex 20** at 67-68.

37. To rebut this point, Malone had a map created that showed the photo in question was taken after the incident when the boat had headed into calmer waters, which was produced with the expert reports. **Ex 1.**

38. Had Chubb offered its $1,000,000 policy limits at mediation and Malone rejected it, then Chubb could have simply tendered the $1,000,000 limits to Lloyds and ended its own exposure. **Ex. 1.**

39. Even though Chubb had been overseeing the defense of the case for over 10 months, Carey admitted that he never did an exposure analysis before this date due to his focus on the coverage concerns, despite mediation being set for June 29th, with the policy limits demand expiring on July 1st. **Ex. 6** at 39-40.

40. Moreover, Chubb never sent Boynes a ROR letter at any time. **Ex. 1**.

41. On June 28, 2022, the day before mediation, Carey sent Boynes a denial of coverage letter, stating that it would not pay for any judgment that might be entered against Boynes because Boynes was supposedly not an Assured under Chubb Policy 486. **Ex 21.**

42. Carey agreed that he did not need Boynes to make this coverage determination, nor did he have any trouble reaching Boynes when he needed to do so. **Ex. 6** at 28, 29-30, 51. Carey's manager, Koudelik, also agreed Boynes was not needed to make this determination (**Ex. 4** at 18, 22, 30), as did Chubb's 30(b)(6) designee, Attorney Amelia Schock, who confirmed that locating Boynes first was never an issue on making the coverage determination. **Ex. 22** at 191-192.

43. While Carey claimed it took him a long time to reach his conclusion that Boynes was not covered for this claim because it was a complicated review (**Ex. 6** at 27), the denial of coverage letter simply said coverage was denied because Boynes was not a Named Insured and had never been added as an additional insured. **Ex. 21.**

44. Vacek testified that Carey or any adjuster could have reached this coverage determination by just looking at the complaint and Policy 486. **Ex. 2** at 85.

45. In that same June 28th letter, Chubb offered to provide a "courtesy defense" to Boynes, specifically designating Attorney Simpson to be the lawyer, which expressly stated that under no circumstances would any payment be made on Boynes' behalf and that this "courtesy defense" could be withdrawn at any time. **Ex. 21**.

46. On June 29, 2022, the mediation proceeded without Chubb's adjuster attending on Boynes' behalf, as only Simpson attended his behalf. **Ex. 1**.

47. During the mediation, Malone made a new offer to Boynes to settle for $10,000,000, with Boynes thereafter to assign his rights against Chubb in exchange for an agreement that Malone would not seek any recovery against Boynes personally. **Ex. 1**.

48. The June 29th mediation ended without any resolution, with the $10,000,000 demand due to expire on July 1, 2022. **Ex. 1**

49. On June 30, 2021, Koudelik made this note in the adjusting file, falsely blaming Boynes for the delay in sending the denial of coverage letter (**Ex. 23**):

> The Captain Kareem Boynes . . . disappeared and recently resurfaced. . . The ROR was issued 6/28 once we had his contact info.

50. Koudelik's June 30th note also discussed a call with Chubb's Underwriter, who advised him that "Chubb never insures the captain." **Ex 23.**

51. On July 23, 2022, Simpson informed Chubb that Boynes had new counsel since he had a conflict due to Malone's $10,000,000 demand to settle with Boynes and take an assignment of his interests, which Simpson told Chubb he thought Boynes would accept. **Ex. 24.**

52. On July 28, 2022, Chubb sent Boynes a letter withdrawing its offer to provide Boynes with a courtesy defense since Boynes had hired another lawyer. **Ex. 25.**

53. Boynes signed a Settlement Agreement with Malone on July 29, 2022, agreeing to a Stipulated Judgment of $6.7 million and assigning all of his rights against Chubb to Malone. **Ex. 26.** At that time, Boynes confirmed that he had never received a ROR from Chubb before receiving the June 28th letter, and also acknowledged that he relied upon Chubb's appointed counsel to fully and properly defend the action filed against him by Malone. **Ex. 26** at 4**.**

54. Boynes filed this lawsuit against Chubb on July 29, 2022. **Ex. 1**

55. When faced with a trial on the limitation action scheduled for March 20, 2023, Chubb abandoned the "limitation" defense and tendered its policy limits to the excess carrier, Lloyds, which it did on February 24, 2023. **Ex. 1.**

56. When its own conduct became an issue in this case, Chubb deposed multiple passengers and hired experts to try to minimize Boynes' liability, including his consumption of alcohol, which it never had Simpson do when defending Boynes. **Ex. 1.**

## II.    Plaintiff's Expert Opinions

To help understand Chubb's conduct, Malone retained several experts.

## A.  The Insurance Adjusting Experts

Plaintiff hired two experts in the area of adjusting insurance claims, Kevin Quinley and Jane Downey. See Ex A and Ex B attached. Chubb received these reports well before its deadline to submit responsive expert reports, but it did not retain its own expert regarding the adjusting flaws described in those reports, meaning their specific findings are unrefuted.

With this comment in mind, a brief review of each opinion is in order. Quinley reviewed all of the adjusting documents in Chubb's file, among other things. Based on his review, he concluded as follows (See Ex A at 30):

> Chubb's claim-handling pattern and practice here shows indifference to its policyholder's financial and **aligns with the conduct of an insurance company prioritizing its own financial interest above that of Capt. Boynes.** (Emphasis added)

In reaching this conclusion, Quinley separated Chubb's adjusting flaws into multiple areas, with a detailed analysis of each one, several of which are key to the issues raised in this motion:

- **Chubb conducted a superficial liability and damages investigation**-Quinley's opinion in this section of his report (Ex A at 12-13) is highly relevant here, as he notes that Chubb did not do any of the normal investigative tasks routinely done by adjusters, nor did their adjusters even do the tasks suggested by Simpson, concluding:

> Skimping on investigations yields no advantage to insureds but financially benefit Chubb by minimizing the time and expense of prompt and thorough investigations. Such behavior aligns with insurance companies placing their monetary interests above those of policyholders. Even if Chubb viewed its coverage defense as airtight, this would not excuse a failure to investigate liability and damages . . . .

- **Chubb's coverage denial was significantly late, received no documented external legal review**-this section of Quinley's report ((Ex A at 16-18) is relevant to Count VII, as he pointed out the multiple problems in Chubb's feigned "coverage" analysis, noting:

  > As an insurance claim industry custom and practice, claim representatives handle coverage issues and denials with a high degree of urgency and dispatch. The notion that an insurer would unreservedly defend a policyholder, issue no reservation of rights and then deny coverage ten months later on the eve of mediation is not the norm. It is a red flag sign of a process defect in the insurance company's claim- handling.

- **Chubb's erratic claim process breached claim industry practices**-Quinley noted multiple flaws in Chubb's claims handling process in this section (Ex A at 20-22):

  > Reasonable claim representatives recognize that the responsibility to conduct thorough investigations does not end when litigation begins. . . . the claim representative's primary responsibility remains rooted in a claim's comprehensive investigation and assessment.

  > An adjuster's role . . . includes actively engaging with defense counsel, monitoring litigation, and suggesting investigative areas of inquiry. . . . Carey's passivity regarding Simpson and his failure to seek the building blocks of a defense for Boynes deviate from insurance claim industry customs, practices, and norms. . . . Well before May 15, 2022, he could and should have strongly urged defense counsel Simpson to (a) depose fact witnesses (including Mr. Malone) or provide a compelling reason not to, (b) request document production from Malone, (c) serve Interrogatories on Mr. Malone, (d) engage one or more medical experts to refute Malone's damages claim, (e) request a Medical Authorization from Malone's attorney, (f) engage a life care planner to refute Lisa Gay's opinions and (g) arrange surveillance on Mr. Malone to validate or challenge his injury and impairment claims. . .

  > Further, the factors prompting Chubb's February 24, 2023 policy limit tender to Lloyds were known—or knowable—to Chubb well before June 2022. Chubb's claim records document no revelatory, game- changing disclosure or information gleaned in the first quarter of 2023 and no new, emerging factors missing or unobtainable by June 2022. Showing a shocking lack of urgency, Chubb delayed the claim process from its first notice of loss (July 2021) until its February 2023 policy limit tender. . . .

- **Chubb ignored multiple indications that it needed to communicate a reservation of rights to Mr. Boynes. Despite these signs, Chubb failed to reserve rights**-Quinley summarized this problem quite succinctly after going over the internal discussion between Chubb's multiple adjusters (Ex A at 22-24) as follows:

  > Chubb and its claim staff were tone-deaf to what should have been recognized as recurring alarms that it needed, ASAP, to reserve coverage rights to Boynes if it was pondering coverage defenses. No reasonable claim professional would view this as conforming to claim industry customs, practices, and norms. As soon as Chubb and its claim staff detected a coverage issue, it should have

immediately sent Boynes a reservation of rights letter, alerting him to specific policy language that could negate his coverage, telling him of his option to retain separate/independent counsel. It should have also communicated to Boynes what Chubb was doing to investigate and resolve any coverage issues or questions. Chubb and its claim staff did none of this.

As noted, Chubb did not retain an expert to refute any aspect of these items in Quinley's report.

Jane Downey also reviewed the adjusting documents in Chubb's file, among other things, and concluded as follows (See Ex B at 1-2) (Emphasis added):

- It is undisputed that a claims adjuster should promptly set a reserve, but not one Chubb adjuster ever set a reserve for the claim against Capt. Boynes. The purpose of a reserve is to make sure funds are available to pay a claim; **thus the failure to set a claim reserve shows that Chubb never intended to provide coverage to Boynes.**

- It is undisputed that a claims adjuster should take the required steps to make sure a proper defense is provided to its insured. However, although Chubb engaged counsel, **the insurer totally failed to take the appropriate claims adjusting steps to make sure such a legal defense was provided to Capt. Boynes, confirming it never intended to provide coverage to Capt. Boynes early in the file handling.**

- It is undisputed that Chubb never issued a ROR letter, providing a defense in the underlying case for almost a year before denying coverage. This letter was requested by not one, but two defense attorneys. The insurer then denied coverage after its appointed counsel recommended a settlement for the $1,000,000 policy limits under P & I 486. **Such inattention to the required protocol for issuing an ROR letter demonstrates that Chubb had already decided to deny coverage and did not think it needed to reserve its rights to later do so.**

Downey also broke down Chubb's adjusting flaws into multiple categories, several of which are also key to this motion as well:

- **Failing to put any reserve at any time on the claim file for Capt. Boynes**-Downey considered this failure as direct evidence that Chubb decided early on not to ultimately provide coverage to Boynes, stating (Ex B at 7-8)(citations to the record omitted):

  > What is extremely unusual about Chubb's file handling from the outset is that no adjuster posted any reserves on the Malone file for Capt. Boynes, although it promptly issued a reserve for Island Time of $150,000, in reliance on its maritime defenses; these defenses were not available to Capt. Boynes. As I earlier noted, a claim reserve is an internal insurer valuation of the unpaid amount of a future claim payment. . . . Chubb's multiple adjusters never posted a reserve on Capt. Boynes' claim file as the insurer never intended to provide coverage to him; the record shows this decision occurred very early in in the claim adjusting process.

- **Failing to provide a proper defense to insured Capt. Boynes, including failing to evaluate and document Chase Malone's injuries and health history, as recommended by Simpson**-like Quinley, Downey was appalled at Chubb's total failure to actually adjust the claim asserted against Boynes, as adjusters normally would do. In this regard, Downey went through the adjusting record in meticulous detail, pointing out the specific facts that document Chubb's failure to provide a proper defense to Boynes (Ex B at 8-15), concluding as follows:

> In short, Chubb completely failed to undertake its responsibilities to Capt. Boynes, as it did no investigation to research, document, validate or dispute Chase Malone's allegations of injury. . . . The only logical explanation for this failure is that Chubb had already decided that it did not plan on providing coverage to Capt. Bones at some point in the claims adjusting process; this decision seems to have been made certainly no later than when it split the adjusting files in late September of 2021.

- **Failing to issue a Reservation of Rights letter to Capt. Boynes before finally denying coverage to him just before the scheduled mediation and the expiration of the policy limits demand-**Downey was also appalled at Chubb's handling of its coverage determination as well as its timing, which she analyzed in depth, noting that 4 adjusters and 2 claims managers all discussed the need to send an ROR at some point in time (Ex B at 15-21), stating in part:

> Chubb claims that it was investigating coverage for Capt. Boynes and that process took over one year. That presumption is preposterous. . . . Chubb adjuster John Carey, who assigned the defense of Capt. Boynes to attorney Simpson, testified that standard insurance claims handling practice is to make a determination of coverage as early as possible after a claim is reported. . . .

> This delay in communicating the coverage declination was prejudicial to Captain Boynes and his defense, particularly since fact discovery was closed when the denial of coverage letters were sent. . . .

As Downey pointed out on the second page of the cover letter for her report:

> Such inattention to the required protocol for issuing an ROR letter demonstrates that Chubb had already decided to deny coverage and did not think it needed to reserve its rights to later do so.

As noted, Chubb did not retain an expert to refute any aspect of Downey's report either.

### B. The "Courtesy Defense" Expert

Plaintiff retained a Virgin Islands lawyer, Clive Rivers, to opine on Boynes' decision not to accept the "courtesy defense" offered by Chubb when it denied coverage. See Ex C. In this regard, Attorney Rivers rendered this opinion regarding Chubb's offer to provide Boynes a "courtesy defense" and Boynes decision not to accept that offer stating (Ex C at p. 3):

> It would have been a mistake for Boynes to agree to allow Chubb to continue representing him after they denied coverage to him, as Chubb affirmatively stated that it would not pay any damages for him and that it could withdraw its defense at any time. Thus, since Chubb would no longer owe any of the fiduciary duties to Boynes that are traditionally owed by an insurance carrier if it continued to provide a defense for him, it was not in Boynes' best interests to allow Chubb to continue handling the defense of his case. **Indeed, such a continuing defense would have only been to benefit Chubb by controlling Boynes' case until Chubb decided it no longer needed his help** . . . . (Emphasis added).

Chubb did not offer an expert opinion to respond to Rivers' report either.

### C. Plaintiff's Maritime/Insurance Defense Expert

Plaintiff hired Bruce Bennett, a maritime lawyer who also has insurance defense experience in the Virgin Islands. His report (Ex D), explains the maritime defenses available to Island Time that were not available to Boynes. His report then discusses why this distinction explains Chubb's calculated decision to mislead Boynes in order to assist in its defense of Island Time, without ultimately providing coverage to Boynes on the claim asserted against him. In doing so, Attorney Bennett rendered this opinion in his report (See Ex D at 8):

> CHUBB's handling of the Malone claim, as described by the CHUBB claim handlers themselves, supports only one reasonable conclusion: from the very beginning of undertaking a defense, CHUBB realized the significant exposure ("claim alert") and so it was CHUBB's intention to seek exoneration/limitation of liability for Island Time and disclaim coverage for Boynes (no Boynes reserve ever set). CHUBB recognized that cooperation from Boynes would be beneficial, if not necessary, to success in any exoneration/limitation proceeding although the relief would not benefit Boynes to any degree. Consequently, CHUBB undertook to provide a "courtesy defense" and thereby avoided alerting Boynes to any coverage issue for fear that it would jeopardize the cooperative relationship and risk any potential success with respect to exoneration/limitation.

Chubb did not offer an expert opinion in response to Bennett's report either.

### D. Attorney Hank Smock

Attorney Smock, retained to render an opinion on another issue, summarized Chubb's conduct in denying coverage on the eve of mediation in his deposition that is also pertinent to Count VII (Ex E at 28):

> I mean, that's the only reason I'm an expert today.  I never do this, and I'm not gonna do it again because it's too much trouble.  But this one just -- just appealed to me because

it was just so unreasonable of what happened, you know, abandoning Captain Boynes right before the mediation. Oh, by the way, there is no coverage. Oh, we'll give you a courtesy defense, but we have the right to withdraw at anytime. **I just found that all outrageous on the part of the company.** (Emphasis added).

None of Chubb's experts, all of whom were deposed after Smock, suggested otherwise.

### E. Summary of the Expert Opinions

In short, all of these experts raised serious issues about Chubb's conduct. With these opinions in mind, it is now appropriate to review the law and facts regarding Count VII.

### III.    Count VII-Prima Facie Tort

Count VII is based on what is known as the *prima facie tort,* articulated in §870 of the Restatement (Second) of Torts as follows:

> One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

In discussing this tort, the Third Circuit pointed out in *Glenn v. Dunlop*, 423 F. App'x 249, 255 (3d Cir. 2011):

> The Restatement provides that the "intent" element of the offense is satisfied where the defendant (1) desires to bring about harm as a consequence of his act, **or (2) knows . . . that harm is certain, or substantially certain, to result from his actions,** Restatement (Second) of Torts § 870 cmt. b; it does not require a plaintiff to prove that the defendant acted *solely* out of an intent to harm.

With this applicable law in mind, Plaintiff will address the merits of Count VII.

### A. Chubb's deliberate conduct warrants relief under Count VII

In this case, the undisputed evidence demonstrates a calculated decision by Chubb to mislead Boynes into thinking he had insurance coverage so that he would cooperate with Chubb in its efforts to limit its exposure on this claim to $150,000 by (1) pursuing a limitation of liability action for Island Time to cap the damages at $150,000 and then (2) abandoning Boynes once it no longer needed his help. These undisputed facts support such a finding:

1) Chubb's adjuster handling the claim, Vacek, analyzed the Complaint when it was filed and issued a claims alert on August 12, 2021, because the injuries alleged could exceed Chubb's policy limits.

2) While Chubb's maritime adjuster, Nieves, found coverage on September 16, 2021, Vacek almost immediately asserted on September 28, 2021, there was a conflict between Boynes and Island Time because Boynes had consumed alcohol while operating the boat, causing Chubb to split the claim files for Island Time.

3) The Chubb claims manager who took over the Boynes claim, David Koudelik, testified that this split was due to coverage issues over the alcohol issues.

4) While Koudelik acknowledged that a ROR letter should have been sent to Boynes so he would be on notice of this potential coverage problem, an ROR was not sent.

5) On October 18, 2021, Chubb filed a Limitation of Liability action for Island Time seeking to cap its liability (and hence, Chubb's exposure) to $150,000.

6) On October 26th, Chubb set a reserve for the claim against Island Time for $150,000 based on the limitation of liability suit, which Vacek felt confident would succeed.

7) However, both Koudelik and John Carey, the Chubb adjuster Koudelik assigned to work on Boynes' file, both testified that no reserve was ever set for the claim against Boynes due to the coverage issues.

8) While Carey then took over 9 months to issue a denial of coverage letter to Boynes, he never did an assessment of Boynes' exposure to Malone's claim during this entire time period, the primary responsibility of a claims adjuster.

9) During that 9 month time period that Koudelik and Carey were responsible for Boynes' claim, the only emails generated by them dealt with coverage issues; however, no ROR letters were ever sent to Boynes during this entire time period.

10) While Carey arranged for Attorney Simpson to take over the defense of the case for Boynes, neither Koudelik nor Carey ever monitored what Attorney Simpson did, nor did they ask him for any reports about what he was doing to defend Boynes.

11) Had they done so, they would have discovered that Simpson did not do any fact discovery, such as sending out written discovery, did nothing to obtain Malone's medical records, as he did not even send a medical authorization to Malone, nor did he take any depositions before fact discovery expired on May 15, 2022.

12) At no time did Koudelik or Carey ever respond to the limited reports issued by Attorney Simpson, nor did they implement any of Simpson's May 23, 2022, recommendations, such as conducting surveillance on Malone or hiring the specific medical experts Simpson suggested--a psychiatrist, a physical therapist and an orthopaedic expert--whose reports were due by July 15th.

13) Had Carey interacted with Simpson, as Quinley and Downey opined he should have done, he could have instructed Simpson to take depositions of the passengers on the

13

boat, **like Chubb decided to do in this case to further investigate the underlying facts because its own conduct is now at issue.**[5]

14) Likewise, he could have learned why Simpson's planned defense based on a photo taken once the boat had reached calmer water was flawed.

15) When a policy limits demand was received from Boynes on June 1, 2022, with mediation set for June 29th, Carey admits he still did not do an assessment of Boynes' exposure.

16) Despite Simpson's admonition in his June 27th report that Malone's damages could exceed $10,000,000 "or more", Chubb ignored the recommendation of both counsel that Chubb offer $1,000,000 at mediation, which would have resulted in Chubb being able to tender its policy limits to Lloyds at that point if it was not accepted.

17) Instead of following the advice of its appointed counsel, Carey simply proceeded with issuing a denial of coverage letter on June 28th.

18) However, at that point, fact discovery was closed, and the deadline for retaining experts was about to expire, without Chubb authorizing Simpson to retain any of the specific experts he recommended.

19) In a last ditch effort to lure Boynes into remaining within Chubb's control while the limitations action was pending, Chubb offered to continue paying Simpson to defend Boynes, although it made it clear they would not pay any judgment against him, and could withdraw that "courtesy defense" at any time.[6]

20) When Simpson told Chubb on July 23, 2022, that Boynes had hired another attorney, Mark Wilczynski, because he had a conflict in continuing to represent him, Chubb promptly withdrew this offer of providing Boynes with a "courtesy defense" on July 28, 2022.

As noted by Plaintiff's adjusting experts, Chubb cannot explain (1) why it never set a reserve for Boynes, (2) why it never sent an ROR to him, (3) why it never did a risk assessment of the

---

[5] Indeed, the extent of fact discovery into the April 17th incident done by Chubb in this case, as well as the retention of certain liability experts like a sea captain and/or a toxicologist, demonstrates that Chubb knows how to defend a case when its liability is on the line—**why didn't it do the same thorough job for Boynes when defending him in the underlying case? The answer is simple—it always intended to deny coverage, so it did not want to spend money on a defense they intended to abandon.**

[6] One of Chubb's own experts, Attorney Atkinson, a professed "bad faith specialist, also recognized why Chubb provided a defense to Boynes, stating (Exhibit F at p. 12):

> *Had a defense not been provided, it is likely that . . . a default judgment would have been entered against Captain Boynes **with the same ultimate effect as the later stipulated judgment.*** (Emphasis added).

In short, Chubb always hoped it could keep Boynes within its control, rather than having to defend a bad faith claim, which also explains why Chubb offered him a courtesy defense.

claim against him, (4) why it failed to monitor Simpson to make sure he provided a proper defense to Boynes and (5) why it never followed any of Simpson's recommendations. Even when it finally denied coverage, Chubb falsely blamed Boynes for the delay. It then tried to keep Boynes under its control by offering a "courtesy defense" limited to its chosen lawyer.

In short, it is clear that Chubb chose to mislead Boynes for the exact reason summarized by Attorney Bennett in his report (Exhibit D, at p. 8):

> CHUBB's handling of the Malone claim, as described by the CHUBB claim handlers themselves, supports only one reasonable conclusion: from the very beginning of undertaking a defense, CHUBB realized the significant exposure ("claim alert") and so it was CHUBB's intention to seek exoneration/limitation of liability for Island Time and disclaim coverage for Boynes (no Boynes reserve ever set). CHUBB recognized that cooperation from Boynes would be beneficial, if not necessary, to success in any exoneration/limitation proceeding although the relief would not benefit Boynes to any degree. Consequently, CHUBB undertook to provide a "courtesy defense" and thereby avoided alerting Boynes to any coverage issue for fear that it would jeopardize the cooperative relationship and risk any potential success with respect to exoneration/limitation.

Thus, the undisputed facts in this case lead to only one reasonable conclusion—Chubb deliberately misled Boynes for as long as it could. In doing so, Chubb, a sophisticated liability insurer, knew Boynes was being harmed without a proper defense of the case being provided to him. As Attorney Smock opined—*such conduct is outrageous.*

**B. The *Banks* analysis supports adopting this tort.**

As the Third Circuit has recognized this tort and the scope of this "intent" element, a Banks analysis may not be needed for this Court. [7] As for the first *Banks* prong, Virgin Islands courts have recognized this tort. For example, the Superior Court recently adopted the findings of its Staff Master, who did a *Banks* analysis and recommended adopting this tort in *Erbey Holding Corporation, et al. v. Blackrock Fin. Mgmt., Inc., et al.,* 2023 WL at 8432847 at **28-

---

[7] The United States Supreme Court also cited § 870 with approval in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657, 128 S.Ct. 2131, 2143, 170 L.Ed.2d 1012 (2008).

33; (Super. Dec. 4, 2023). A prior Superior Court holding had also done a *Banks* analysis in *Bank of Nova Scotia v. Boynes,* 2016 WL 6268827, at *3, n. 16 (V.I.Super. Ct. 2016):

> While the Supreme Court of the Virgin Islands has not yet weighed in on the issue, the Third Circuit, the District Court of the Virgin Islands, and the Superior Court have all recognized prima facie tort as a viable cause of action. In addition, many other jurisdictions also recognize prima facie tort as actionable. See, e.g., *The Modern Prima Facie Tort Doctrine,* 79 Ky. L.J. 519, 525–27 (1990/1991) ("twenty-one states, including New Jersey, plus the Virgin Islands and District of Columbia recognize prima facie tort"). Given that prima facie tort fills in gaps in the law and grants relief where there may not be any available, the Court finds that recognition of prima facie tort as a cause of action represents the soundest rule for the Virgin Islands and is in accord with local public policy.

This tort has also been recognized by this Court. *See, Gov't Guarantee Fund of Finland v Hyatt Corporation,* 955 F. Supp. 441, 463 (D.V.I. 1997).

As for the second *Banks* prong*, Boynes, supra,* noted that this tort has been recognized by most other jurisdiction as well, citing *The Modern Prima Facie Tort Doctrine,* 79 Ky. L.J. 519, 525–27 (1990/1991) ("twenty-one states, including New Jersey, plus the Virgin Islands and District of Columbia recognize prima facie tort"). In *Erbey, supra,* the Staff Master discussed this article, and the cases it cited, in more detail, but reached the same conclusion— the majority view clearly supports the adoption of this standard.

As for the third prong of *Banks*, the *prima facie tort* serves the two goals of tort law— "deterrence and compensation"—which is the guiding principle in establishing the soundest rule for the Virgin Islands under the Supreme Court holding in *Walters v Walters,* 2014 WL 1681319, at *5. In short, recognizing this tort is the soundest view for the Virgin Islands.

Finally, as noted in *Glenn v. Dunlop*, 423 F. App'x 249, 255 (3d Cir. 2011), *prima facie* tort claims typically provide relief only where the defendant's conduct "does not come within the requirements of one of the well established and named intentional torts", citing the. Restatement (Second) of Torts § 870 cmt. a. However, there does not appear to be any such "named" similar tort based on Chubb's conduct here, which moots this issue.

16

## IV.    Conclusion

For the reasons set forth herein, it is respectfully submitted that partial summary judgment should be granted as to Count VII of the Amended Complaint. Chubb's calculated actions were "generally culpable and not justifiable under the circumstances," resulting in harm to Boynes, which Chubb knew was substantially certain to happen as a result of its decision to mislead Boynes instead of simply handling his claim in the normal course of business.

Dated: March 18, 2024

/s/ Joel H. Holt
Joel H. Holt, VI Bar No. 6
Law Office of Joel H. Holt, Esq. P.C.
2132 Company Street
Christiansted, VI 00820
T: (340) 773-8709/F: (340) 773-8677
holtvi@aol.com / joelholtpc@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was served this 18th day of March, 2024, by this Court's ECF system as well as by email on:

Robert J. Kuczynski, Esq., VI Bar No. 1260
Beckstedt & Kuczynski LLP
2162 Church Street
Christiansted, VI 00820
robb@beckstedtlaw.com

John David Dickenson, Esq.
Cozen O'Connor
1081 N. Military Trail, Suite 200
Boca Raton, FL 33431
jdickenson@cozen.com
sbrier@cozen.com

Tiffany Bustamante O'Quinn, Esq.
Cozen O'Connor
200 S. Biscayne Boulevard, Suite 3000
Miami, FL 33131
toquinn@cozen.com

/s/ Joel H. Holt

17